**UNITED STATES of America**

v.

**Joseph PUNGITORE.**

No. CIV.A. 97–2972.
No. CR. 88–00003–09.

United States District Court,
E.D. Pennsylvania.

Aug. 5, 1998.

David E. Fritchey, Asst.U.S.Atty., Philadelphia, PA, for government.

Cheryl J. Sturm, Westtown, PA, for Defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Petitioner, following in the footsteps of his co-defendants Nicodemo Scarfo, Frank Nar-

ducci, Philip Narducci, Frances Iannarella, Jr., Ralph Staino, Salvatore Merlino and Anthony Pungitore, Jr., has filed a § 2255 Motion asking us to overturn his conviction and sentence for his crimes committed while a soldier in the Philadelphia mafia.

Mr. Pungitore's motion first asks the court to recuse itself. Next, Petitioner argues that his conviction and sentence should be overturned under the Fifth Amendment since: (1) the government failed to turn over *Brady* material, (2) the court erred in instructing the jury on the issue of reasonable doubt, and (3) the court's consecutive sentences for RICO and RICO Conspiracy violate the Constitution's bar against double jeopardy. Finally, Petitioner asserts that his conviction and sentence should be overturned under the Sixth Amendment because: (1) Petitioner was constructively denied counsel due to threats leveled against both him and his attorney by the Petitioner's co-defendants; (2) Petitioner was denied effective assistance of counsel at trial; and (3) Petitioner was denied effective assistance of counsel in plea bargaining.

Though some of the issues raised by Petitioner are more complicated than those raised by his fellow co-defendants, the end result is the same. Following a May 13, 1998 hearing in open court and for the reasons that follow, Petitioner's motion will be denied.

## II. FACTS AND PROCEDURAL HISTORY

In January of 1988, Joseph Pungitore was indicted for RICO, RICO Conspiracy, Illegal Gambling Business, and Conspiracy to Distribute Methamphetamine. He was charged in this indictment with 18 other fully initiated members of the Philadelphia La Cosa Nostra family. The indictment was superseded in June, 1988.

Petitioner was represented by attorney Stephen Robert LaCheen during the pretrial proceedings and at trial. On June 30, 1988 Joseph Pungitore, through Mr. LaCheen, filed a number of motions, including a motion to sever. His motion cited the following typical reasons for severance: (a) that various defendants might present materially different or mutually exclusive defenses, (b) that any defendant who chose to testify in a joint trial would become an unwitting government witness against his co-defendants, (c) that if any of his co-defendants chose to testify on their own behalf, he (Mr. Pungitore) might be forced to testify on his own behalf to refute accusations from the co-defendant, and (d) that he would be prevented from calling co-defendants as witnesses because of their Fifth Amendment rights.

While other defendants joined in various motions of their co-defendants, no defendant joined Joseph Pungitore's severance motion. Consequently, on July 13, 1988, the court issued an order to the effect that each defendant would be deemed to have joined in every applicable motion filed by a co-defendant with the exception of Joseph Pungitore's June 30, 1988 motion to sever.

The case was called for trial on September 8, 1988. At that time a number of pre-trial issues remained to be decided before the commencement of jury selection. One of these was the severance motion, which was argued on September 9, 1988. Mr. LaCheen declined to make any evidentiary presentation in support of the motion and argued only that severance into three or four separate trials might make it easier for the court to handle the case. The court pressed Mr. LaCheen by asking him: "you're not telling me, that if you were severed that there's somebody that would come and testify on your behalf or something?" Mr. LaCheen stated: "I'm not making a specific—that's correct." The motion was denied. *Tr. 9/9/88* at 20–21. The case proceeded to trial. Apparently content to be tried with his co-defendants, Mr. Pungitore never again raised the severance issue, and the case went to the jury.

On November 19, 1988, the jury returned its verdict, finding Joseph Pungitore guilty of all charges against him: RICO, RICO Conspiracy, Conspiracy to Distribute Methamphetamine, and Operating an Illegal Sports Bookmaking Business. More specifically, with respect to RICO, the jury found the Petitioner guilty of all nine racketeering acts

expressly charged against him in the indictment:[1]

(1) Racketeering Act # 5—both conspiracy to murder and the murder of Frank Narducci in which the evidence showed Mr. Pungitore to be one of the two shooters who pumped approximately ten bullets into Narducci virtually on the doorstep of his house as he was returning home from his federal court trial;

(2) Racketeering Act # 6—both conspiracy to murder and the attempted murder of Harry Riccobene in which the evidence showed that Pungitore was a Scarfo loyalist in the "Riccobene War", and in that capacity, he was part of a hit team that stalked Riccobene and plotted his murder; evidence showed that Petitioner and Salvatore Grande caught Riccobene in a phone booth and Grande shot at him and then fled in a car driven by Mr. Pungitore;

(3) Racketeering Act # 9—both conspiracy to murder and the attempted murder of Frank Martines, in which the evidence showed that Mr. Pungitore was part of a Scarfo loyalist hit team in the "Riccobene War", and in that capacity acted as a blocker when Martines was ambushed and shot in the head;

(4) Racketeering Act # 11—both conspiracy to murder and the murder of Robert Riccobene, in which the evidence showed that Mr. Pungitore was part of a Scarfo loyalist hit team in the "Riccobene War", and in that capacity drove the get away car after Francis Iannarella, Jr. shot and killed Riccobene;

(5) Racketeering Act # 12—both conspiracy to murder and the murder of Salvatore Testa, in which the evidence showed that Mr. Pungitore, on orders from Philadelphia La Cosa Nostra mob boss Nicodemo Scarfo, lured his best friend, Testa, into a fatal ambush;

(6) Racketeering Act # 18—operation of an illegal lottery business, in which Mr. Pungitore was the operational chief;

(7) Racketeering Act # 19—operation of an illegal sports bookmaking business, in which Mr. Pungitore was the operational chief and owned one-third of the business, in partnership with Scarfo and other high ranking mobsters;

(8) Racketeering Act # 20—conspiracy to distribute methamphetamine, where the evidence showed Mr. Pungitore, while assiduously avoiding personal contact with the actual drugs, financed drug trafficking, received commissions for sending drug buyers to drug suppliers and entered into a business partnership with a drug trafficker;

(9) Racketeering Act # 35—extortion of Michael Madgin, where the evidence showed that Mr. Pungitore shook down a known drug trafficker, loanshark and bookmaker on behalf of the Philadelphia mob and kept a split of the extortion proceeds for himself.

Conviction of any two of these racketeering acts would have constituted a pattern of racketeering activity sufficient to justify Petitioner's RICO conviction. As the record reflects, Mr. Pungitore was convicted of all nine, and all of the component parts of those racketeering acts that had constituent parts. Additionally, Mr. Pungitore was found guilty of RICO by virtue of his participation in two different collection of unlawful debt schemes: (1) Collection of Unlawful Debt Scheme # 3—the collection of debts accrued through the operation of an unlawful sports bookmaking business; and (2) Collection of Unlawful Debt Scheme # 4—the collection of debt accrued through a usurious loan business. Each of these schemes, by itself, and independent of the racketeering acts, was sufficient to justify Mr. Pungitore's RICO conviction.

---

**1.** Some racketeering acts had more than one component. A finding that either component was proved was sufficient for the jury to find that the government had proved the racketeering act. For example, with respect to racketeering act # 11, the jury could have found that the government proved this racketeering act if it found either that Mr. Pungitore was guilty of conspiracy to murder Robert Riccobene or of the actual murder of Riccobene. In fact the jury found Mr. Pungitore guilty of both components of this racketeering act, as it found him guilty of all components in every racketeering act that contained multiple components.

Extensive testimony concerning the RICO enterprise [the Philadelphia La Cosa Nostra family] was presented at trial. The evidence established that La Cosa Nostra was a criminal organization structured in families throughout the United States. Each family had its own boss, and La Cosa Nostra, itself, was governed by an eleven member commission that consisted of the bosses of the five New York families and the bosses of six other families from elsewhere in the United States. The Philadelphia La Cosa Nostra family consisted of about sixty members and operated in Pennsylvania and New Jersey; its boss since the early 1980's was Nicodemo Scarfo. A La Cosa Nostra family was headed by a boss, who had the sole and absolute authority to "make", i.e., initiate members, promote and demote officers and order killings. All members owe a duty of absolute obedience to the boss. Other officers included the underboss, a consigliere (counselor), and capos. Fully initiated members held the rank of soldier. In order to be "made", one had to be a male of Italian descent who had participated in some way in a La Cosa Nostra sanctioned murder.

La Cosa Nostra employed a ritual initiation ceremony. A proposed member would be brought to a meeting of the active membership over which the boss presided. He would be called into a room and asked if he wanted to join the group. A gun and a knife would be before him on a table. Once he agreed, he would be asked if he would use the gun and knife to help his comrades. Once he agreed again, his trigger finger would be pricked, and he would cup his hands to hold a holy card. The card would be burned in his cupped hands as he was told that he would burn like the picture of the

saint if he betrayed his friends. He would then kiss everybody and shake everybody's hand. The boss would then assign him to the regime of a capo and explain La Cosa Nostra's rules, one of which was that there was a code of silence. The penalty for breaking the code of silence was death. La Cosa Nostra becomes the most important thing in a member's life, coming before his wife, children, parents, personal affairs, etc. *Tr. 10/10/88* at 72–80, 123–26; *Tr. 10/26/88* at 178–91, 201. Evidence at trial established that Joseph Pungitore was "made" following his participation in the January, 1982 murder of Frank Narducci, Sr. *Tr. 10/10/88* at 114–20, 125–26. At that time he was 25 years old.

The evidence established that Petitioner's father, Anthony Pungitore, Sr. was "made" before him, and his brother and co-defendant Anthony Pungitore, Jr., was "made" after him. While Joseph Pungitore's shooting of Frank Narducci, Sr. qualified him to be "made", the murders he participated in thereafter were done in obedience to the rules of La Cosa Nostra and the orders of the boss, Nicodemo Scarfo.

It is hardly surprising that Petitioner was convicted on all charges. A tidal wave of evidence was introduced against him. Four separate cooperating witnesses, Del Giorno, Caramandi, Norman Lit and Michael Madgin, all testified against him. Del Giorno and Caramandi were damning enough by themselves.[2] Furthermore, Lit and Madgin, both of whom were La Cosa Nostra associates of Pungitore, testified for nearly a week, and numerous wiretapped conversations involving Mr. Pungitore were introduced through and explained by them. Petitioner's own words

---

**2.** Petitioner seems to believe that we are not entitled to cast the testimony of Del Giorno and Caramandi in the light most favorable to the prosecution and the jury verdict because they are "paid informants who are presumptively unreliable." *Petitioner's Reply to Government's Response to Joseph Pungitore's Supplemental Memorandum in Support of His Section 2255 Motion* ("*Petitioner's Reply*") at 1. Petitioner cites to the Tenth Circuit's decision in *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), *reh'g en banc granted, opinion vacated*, No. 97–3178 (10th Cir. July 10, 1998), to support this proposition. First of all, *Singleton* is not and has never been

the law of the Third Circuit. Secondly, *Singleton* does not stand for the proposition that habeas courts cannot rely on the testimony of informants which has already been accepted by a jury. Third, *Singleton* has been vacated and is no longer good law even in the Tenth Circuit. And fourth, Petitioner has cited to no cases within the Third Circuit (or any other circuit, for that matter) which state that this court is not allowed to present the prosecution's testimony in the light most favorable to the government after the Petitioner has been found guilty of his crimes beyond a reasonable doubt.

were sufficient to convict him of RICO, RICO Conspiracy, Conspiracy to Distribute Methamphetamine and Illegal Gambling Business. There was probably more evidence introduced against Joseph Pungitore than against any other defendant in the case.

Following denial of post-verdict motions, *United States v. Scarfo*, 711 F.Supp. 1315 (E.D.Pa.1989), Joseph Pungitore was sentenced on May 5, 1989 to a term of 40 years imprisonment. Through the sentencing phase of the proceedings, Joseph Pungitore was represented by Mr. LaCheen. Peter F. Goldberger, Esq., represented the Petitioner on appeal. Mr. Pungitore appealed from judgment of sentence without success. *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).

In May, 1991, Joseph Pungitore wrote this court a letter in which he accepted responsibility for his criminal conduct, expressly characterized his prior life style as "parasitic," and acknowledged that by choosing to victimize others he subjected himself to whatever penalties resulted from that choice. He went on to express remorse for his past wrongs and hoped that he could go on to live a better and more moral life in the future. Thereafter, in the fall of 1991, Mr. Goldberger filed a motion to modify sentence pursuant to then Fed.R.Crim.P. 35(b). Mr. Pungitore's May 5, 1991 letter to this court was cited as a principal reason for reducing his sentence, inasmuch as it showed that he "freely acknowledged the immorality of the social code to which he formerly adhered," and demonstrated his growing insight and potential for rehabilitation. Relief was denied.

Five more years passed, and, on April 24, 1997, Petitioner filed the instant motion for relief pursuant to 28 U.S.C. § 2255. We held a hearing on May 13, 1998.

### III. DISCUSSION

*A. Recusal*

Petitioner urges the court to recuse itself from this case, unless we plan to find in his favor: "The conviction and sentence should be vacated. If the Court is contemplating any other outcome, the case should be reassigned to another judge whose impartiality is not questionable." *Supplemental Memorandum of Law in Support of Joseph Pungitore's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. 2255* ("*Petitioner's Supplemental Memorandum* ") at 28.

According to the recusal statute, a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). *See also Liteky v. United States*, 510 U.S. 540, 541, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *United States v. Antar*, 53 F.3d 568, 573 (3d Cir.1995). Both the Supreme Court and the Third Circuit have made it clear that "generally beliefs or opinions which merit recusal must involve an extrajudicial factor." *Antar*, 53 F.3d at 574 (*citing Liteky*, 510 U.S. at 554, 114 S.Ct. 1147, 127 L.Ed.2d 474).

Still, the exceptional case can arise where opinions formed during the course of judicial proceedings may give rise to the duty to recuse. *Id.* However, "[b]iases stemming from facts gleaned during judicial proceedings themselves must be particularly strong in order to merit recusal." *Id.* The mere fact that a judge who presides at trial may "be exceedingly ill disposed toward the defendant, who has been shown to be a thoroughly reprehensible person," does not thereby render him "recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings...." *Liteky*, 510 U.S. at 550–51, 114 S.Ct. 1147. Furthermore, the Supreme Court has recognized that opinions held by judges as a result of what they learned in earlier proceedings should "not be subject to deprecatory characterization as 'bias' or 'prejudice'." *Id.* at 551, 114 S.Ct. 1147. A predisposition gained during the course of a trial may be considered a bias only when "it is so extreme as to display clear inability to render fair judgment." *Antar*, 53 F.3d at 574 (*quoting Liteky*, 510 U.S. at 551, 114 S.Ct. 1147).

Petitioner looks toward a number of rulings we made during the course of considering his § 2255 motion as reasons why a

reasonable onlooker might question this court's impartiality. He points out that we allowed the government to file its initial response to Petitioner's § 2255 motion months after it was due, even though the government never applied for an enlargement of time. Petitioner contrasts this to our finding that certain motions which he made at the evidentiary hearing were untimely. Petitioner also states that this court's bias against him is demonstrated by the fact that we did not grant his discovery motion and that we allowed Assistant United States Attorney Fritchey to "testify" in response to the § 2255 motion in violation of the witness/advocate rule. Petitioner claims that our prejudice is further evidenced by the fact that we allowed Mr. Gordon, the First Assistant District Attorney of Philadelphia (and a former AUSA who was one of the government's lead attorney's on the Petitioner's 1989 trial), to act as counsel for the government absent "any tangible evidence that Mr. Gordon's appointment as a Special Assistant United States Attorney had not expired." *Petitioner's Supplemental Memorandum* at 28. Finally, Petitioner relies on his trial attorney's statement that he saw the court as having its own agenda to support his argument that the court is biased and should recuse itself. *Memorandum of Law in Support of Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. 2255 ("Petitioner's Original Memorandum")* at 21. We believe that none of these rulings, either individually or together, are evidence from which a reasonable person could doubt this court's impartiality.

█ Petitioner complains that this court "disregarded the Government' [sic] discourteous attitude toward the Court and counsel," when we allowed it to file its response to Petitioner's § 2255 motion in November of 1997, four months after the original July deadline imposed by this court. While we were unhappy with the government's delay, we realized that the government had to respond to the numerous petitions filed by Petitioner's co-defendants. Indeed, AUSA Fritchey has had to respond to no less than ten habeas corpus motions filed by the Scarfo defendants, not to mention eight additional requests for certificates of appealability. We

are aware that though AUSA Fritchey originally tried this case with three other AUSA's, they have since then left the office and Mr. Fritchey has been required to handle the bulk of this work by himself. Furthermore, the government's delay in filing its response did not, in any way, prejudice the Petitioner. Petitioner still had almost six months to prepare for the May 1998 hearing in this case.

█ On the other hand, we did criticize Petitioner's last minute discovery motion as untimely. Petitioner filed his discovery motion on Friday, May 8th—less than a week before the hearing, even though almost six months had passed since the government had filed its response. We felt that the untimeliness of the motion did, in this case, unfairly prejudice the government. Yet, we still considered the merits of the discovery motion despite the fact that it was filed at the last minute. *See Tr. 5/13/98* at 13–21. Therefore, we do not believe that our criticism of the Petitioner's attorney demonstrated a bias against Mr. Pungitore.

█ Furthermore, we fail to see how our denial of certain portions of Petitioner's discovery motion can be construed as bias against the Petitioner. Indeed, as Petitioner recognizes, discovery with regard to a § 2255 motion is discretionary. *Id.* at 17. Some of Petitioner's requests, such as the security measures taken by the marshal service, were completely irrelevant to Petitioner's case and constituted nothing more than grasping at straws. *Id.* at 17–18. Other requests, such as the one for any documents made in connection with an alleged attempt to plea bargain with the Petitioner, were granted—although no such documents existed. *Id.* at 18. In any case, we were wholly satisfied with the government's responses to Petitioner's discovery questions and are confident that the record of the hearing reflects that we based our discovery rulings on what we believed to be fair within the bounds of the law, and not on any bias or predisposition against the Petitioner. *Id.* at 17–21. Furthermore, as a matter of law, we do not believe that AUSA Fritchey's responses to Petitioner's discovery motion disqualified him to serve as

the government's attorney under the witness-advocate rule.

We also do not feel that any bias was shown by our decision to allow Mr. Gordon to serve as a government attorney without "any tangible evidence" that his appointment as a Special Assistant United States Attorney had not expired. Before we allowed Mr. Gordon to question any witnesses, we required that AUSA Fritchey check with his office to make sure that Mr. Gordon was still a Special AUSA. Mr. Fritchey called his office and represented to this court that Mr. Gordon's commission ran through October 1998. Petitioner presented no evidence that this was not the case, and we saw no reason not to take Mr. Fritchey at his word. Indeed, Mr. Fritchey has practiced before this court over the course of the last ten years and we have never found him to be dishonest.

Finally, the statement of Petitioner's trial attorney, Mr. LaCheen, that this court was seen as "having its own agenda," is completely baseless. *Petitioner's Original Memorandum, Ex. A.* We had, and still have, only one agenda: *making sure that Petitioner's case is dealt with fairly and under the full protection of the Constitution and laws of the United States.*

So while accepting the Petitioner's invitation to recuse ourselves would save this court a lot of time and effort, we cannot in good conscience do so. Mr. Pungitore has not stated a case for recusal.[3] Moreover, strong policy grounds exist to preclude the granting of recusals for the asking.[4] One cannot es-

---

3. The cases cited by Petitioner that have not been discussed above are either inapposite or distinguishable. Reading Mr. Pungitore's brief on its face, the most intriguing is *United States v. Robin,* 553 F.2d 8 (2d Cir.1977), which he cites for the proposition that reassignment to another judge is appropriate to prevent a trial judge from giving consideration to a § 2255 motion critical to that judge's rulings. Pungitore miscites *Robin.* In *Robin* the Second Circuit remanded the case to a different judge for resentencing. In explaining its rationale, *Robin* cited *Halliday v. United States,* 380 F.2d 270, 272–74 (1st Cir. 1967), for the proposition that a sentencing judge should not normally conduct the hearing on a § 2255 petition challenging the validity of that judge's prior determination that the guilty plea was voluntary. *Halliday* was decided ten years before Congress established the Rules Governing § 2255 Proceedings. These rules have been in effect since February 1, 1977, and they expressly adopt a view that is contrary to *Halliday.* Rule 4(a) provides in pertinent part: "The original motion shall be presented promptly to the judge of the district court who presided at the movant's trial and sentenced him ..." *See also* Rules 4(b), 7 and 8.

 In *United States v. Gaviria,* 49 F.3d 89 (2d Cir.1995), another decision cited by the Petitioner, the case was remanded for resentencing before a different judge in light of a misunderstanding over whether the defendant was to receive a two level reduction for minor role in the offense. The trial court expressed a fixed opinion regarding how it would impose sentence that made clear that remand would be an empty gesture. In *United States v. Edwardo–Franco,* 885 F.2d 1002 (2d Cir.1989), three defendants were entitled to new trials as a result of the trial judge's pejorative statements regarding their Colombian nationality. The judge said: "They don't have too much regard for Judges. They only killed 32 Chief Judges in that nation ... They should

have stayed where they were. Nobody told them to come here." In response, one of the defendants said in broken English: "I ask, request that the sentencing be done, as for my person, not for my nationality." Not surprisingly, the Second Circuit found that the trial judge's comments gave the appearance of extra-judicial bias. Needless to say, nothing like what happened in *Gaviria* and *Edwardo–Franco* happened in Mr. Pungitore's case.

4. A liberal recusal policy would encourage judge shopping. This problem was not lost on the framers of the 28 U.S.C. § 455. As the legislative history cautions:

 Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

 H.R.Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad. News 6351, 6355. *Dalfonso,* 707 F.2d at 761.

 Moreover, as the Second Circuit noted in *Robin,* 553 F.2d at 11:

 When the original judge has gained familiarity with a detailed factual record, which is vital to the determination to be made on remand, and the reversal is not based on erroneous findings or the admission of prejudicial evidence that would be difficult to erase from the mind, the case may properly be remanded to the original trial judge, since assignment to a different judge would only entail wasteful delay or duplicated effort.

 The trial transcript of this case alone consists of more than fifty volumes. Proceedings have

cape the conclusion that Petitioner wants a recusal because he fears that this court knows the case and the record well enough to more easily recognize the disingenuous and insubstantial nature of his § 2255 petition. The prospect of losing a motion is not a valid basis for a recusal.

### B. Fifth Amendment Claims

Petitioner makes three claims under the Fifth Amendment: (1) that the prosecution failed to provide important *Brady* material; (2) that the court erred in instructing the jury on the meaning of reasonable doubt; and (3) that Petitioner's consecutive sentences for RICO and RICO Conspiracy violate the Constitution's prohibition against double jeopardy. Each of these arguments is meritless and none entitle the Petitioner to a new trial.

### 1. Brady

 Based upon nothing more than a passage in a book entitled *Breaking the Mob*, by former Philadelphia Police Department Captain Frank Friel, Petitioner claims that the government suppressed *Brady* material. Petitioner's novel argument is completely without merit. "A valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir.1991). Petitioner fails to prove any of these three essential elements.

Captain Friel's book refers to seemingly positive, but actually false, leads in the investigation of the 1984 murder of Salvatore Testa from two different individuals that caused the police department to waste time

trying to trace the movements of Testa after the time that he had actually died.[5] At trial the defense called the caretaker, Louis Palladino, in an attempt to show that Testa was alive after the cooperating government witnesses claimed he was dead. The caretaker testified as the defense expected, despite being damaged somewhat on cross-examination. On rebuttal, the government produced the nursemaid who completely contradicted the caretaker. Apparently, the jury found the nursemaid the more credible of the two witnesses. Petitioner complains that he could have corroborated the testimony of the caretaker if he had known about the police sergeant's alleged sighting of Testa on the evening of September 14, 1984. In his memorandum supporting his § 2255 motion, Mr. Pungitore identifies the officer as "Thomas Laciardello." Apparently, this is a reference to Thomas Liciardello, a retired Philadelphia Police Officer who states that he was interviewed by a person purporting to represent Mr. Pungitore or one of his co-defendants approximately one or two years ago.

Needless to say, Mr. Pungitore could not have called a book to the witness stand during his 1988 trial, particularly a book that had not been published.[6] Instead, he would have needed testimony of a non-hearsay nature from a live witness, specifically, Thomas Liciardello. Despite having the burden of proof, Mr. Pungitore did not call Mr. Liciardello. The government, however, did call Mr. Liciardello as a witness at the § 2255 hearing. Mr. Liciardello testified that he did not see Testa on the evening of September 14, 1984, several hours after Petitioner led him to his death, or at any other time that day. Officer Liciardello knew when Testa's dead body was found and knew that he saw him alive a day or two before, not the eve-

occurred intermittently for the past ten years. Mr. Pungitore's basis for recusal and reassignment has all the substantiality of a soap bubble in a hurricane, and reassignment of his case to another judge would amount to a waste of judicial resources.

**5.** "Two seemingly positive [leads], however, were forthcoming. A police sergeant attached to the Narcotics Unit reported observing Salvy in the company of Joe Pungitore around 6 p.m. on the 14th (It must have been the 13th.) Soon after, a caretaker on the Girard Estates came forward.

He also had seen Salvy, he said, in the early evening of the 14th talking to a nursemaid and her children who lived nearby. The nanny disputed that; she didn't remember seeing Salvy that evening and added he never spoke to her or the children. Because of the erroneous information from the officer and the caretaker, we wasted large amounts of time trying to trace the evening movements of a man who had died at noon." *Breaking the Mob,* at p. 191.

**6.** *Breaking the Mob* was published in 1990.

ning that his discarded corpse was found lying in the dirt in New Jersey. *Tr. 5/13/98* at 187–202. If certain individuals in the police department misunderstood when Mr. Liciardello said he saw Testa alive, this was the product of miscommunication that did not alter the facts. Had Officer Liciardello been called to testify at trial in this case, he would not have corroborated Mr. Palladino's testimony. On the contrary, he would have testified that he saw Testa one or two days before Palladino's claimed sighting, but not on the same evening Testa's dead body was found. Therefore, Mr. Liciardello's testimony would not have been helpful to the defense.

There is no basis in fact for Petitioner to claim that but for the government's suppression of *Brady* material, he would have presented corroborative exculpatory evidence at his trial. If anything, calling Mr. Liciardello to the witness stand would have hurt Petitioner, because Liciardello's sighting of him with Testa within roughly forty-eight hours of Testa's death tends to corroborate the testimony of the cooperating government witnesses that Pungitore, in a Judas-like fashion, led his "best friend" to his death. Therefore, Petitioner has failed to show that the evidence the government allegedly suppressed was either exculpatory or material.

Furthermore, Mr. Liciardello's testimony cannot be considered *Brady* material in the first place since Petitioner has provided no evidence that it was suppressed by the government. As Mr. Liciardello testified, he was not assigned to the investigation of the Testa murder and was not part of the prosecutive team of either the Testa murder case in state court or the RICO prosecution in federal court. Petitioner has presented no evidence that the information he believes he was entitled to was ever even under the government's control. The government can-

not be held to have violated *Brady* by not providing information which it did not itself have.

Petitioner has failed to show that the government suppressed evidence, that the alleged evidence was exculpatory, or that the alleged evidence was material. Petitioner's position is therefore without merit.[7]

## 2. Reasonable Doubt Instruction

We turn next to Petitioner's claim that the court erred in instructing the jury on the concept of reasonable doubt. Mr. Pungitore complains that the court gave an erroneous reasonable doubt instruction that deprived him of his right to due process under the Fifth Amendment. He claims that the court erred by telling the jury that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt." *Tr. 11/17/88* at 12.

First, the court's reasonable doubt instruction was challenged on direct appeal and affirmed by the Third Circuit. *Pungitore,* 910 F.2d at 1144–45. Second, to the extent that Petitioner's argument varies from the reasonable doubt issue resolved on direct appeal, the issue has been procedurally defaulted since Petitioner has failed to show either cause for or prejudice from not raising this argument *See United States v. Iannarella,* 992 F.Supp. 766, 771 (1997). Yet, even if this claim had been properly raised, it has no merit.

A district court has broad discretion in choosing both the language and the form of its jury instructions. *United States v. Hiland,* 909 F.2d 1114, 1128 (8th Cir.1990). Any jury charge must be viewed in the context of the overall charge to the jury. *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

---

7. Even if, contrary to the facts, Mr. Liciardello believed and had testified at trial that he did see Testa after DelGiorno and Caramandi testified he was dead, such testimony at most would have raised a reasonable doubt as to part of the basis of the verdict as to one racketeering act of the many the jury found Mr. Pungitore to have committed. Petitioner could still have been found guilty of the Salvatore Testa murder racketeering act on the basis that he conspired to kill Testa.

And, even without the Testa racketeering act, there was still overwhelming evidence of Mr. Pungitore's guilt of RICO and RICO Conspiracy on both the pattern of racketeering act and collection of unlawful debt theories. Indeed, there was sufficient electronic surveillance evidence alone to convict him of RICO and RICO Conspiracy, without any reference to the Testa homicide or any of the other homicides in which he participated.

In the instant case, the court provided extensive instructions on the meaning of reasonable doubt, including distinguishing it from the burden in a civil case. In making his claim of error, defendant selectively quotes from the record. Following its statement that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt," the court provided the classic definition of reasonable doubt: "Another definition is that a reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in their own affairs." *Tr. 11/17/88* at 12. Taking the jury instruction in context, and viewing all the instructions as whole, it is clear that Petitioner's claim is frivolous.

### 3. Double Jeopardy

Petitioner, like his co-defendants, argues that his consecutive sentences for RICO and RICO Conspiracy violate the Double Jeopardy clause of the Fifth Amendment. We disagree.

█ First, this issue was raised on direct appeal and resolved against the defendants. *Pungitore,* 910 F.2d at 1115–17. Therefore, this argument is precluded as the law of the case.

Second, Petitioner and his co-defendants have suggested that the Supreme Court's decision in *Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996), decided after the Petitioner's direct appeal, requires reversal of the Petitioner's consecutive sentences. The court's resolution of the identical argument in *United States v. Scarfo,* 980 F.Supp. 803, 818 (E.D.Pa.1997), is dispositive. *See also Iannarella,* 992 F.Supp. at 768.

Finally, Petitioner argues that "[f]ollowing enactment of the Sentencing Reform Act ["SRA"], imposition of a sentence for RICO conspiracy and substantive RICO predicates is inconsistent with Congressional intent, and therefore a violation of the Double Jeopardy Clause." *Petitioner's Original Memorandum* at 19. Petitioner cites to 28 U.S.C.

§§ 994(*l*)(1)(A) and 994(*l*)(2) to support his argument.

The first section of the SRA provides:

The [Sentencing] Commission shall ensure that the guidelines promulgated pursuant to subsection (a)(1) reflect—(1) the appropriateness of imposing an incremental penalty for each offense in a case in which the defendant is convicted of—(A) multiple offenses committed in the same course of conduct that result in the exercise of ancillary jurisdiction over one or more of the offenses[.]

28 U.S.C. § 994(*l*)(1)(A).

The second section of the SRA cited by the Petitioner reads:

The Commission shall ensure that the guidelines reflect … the general inappropriateness of imposing consecutive terms for an offense of conspiring to commit an offense … and for an offense that was the sole object of the conspiracy. . . .

28 U.S.C. § 994(*l*)(2).

█ Petitioner seems to argue that since the SRA specifically states that it is generally inappropriate for a person to be sentenced consecutively for an offense and for conspiracy to commit that offense, that Petitioner's sentences for RICO and RICO Conspiracy violate the Fifth Amendment's prohibition against double jeopardy. This argument, though persuasive at first glance, does not survive upon closer scrutiny. The provisions of the SRA cited by the Petitioner apply to sentences imposed under the Sentencing Guidelines. The Sentencing Guidelines, however, do not apply to crimes committed before November 1, 1987. *United States v. Roederer,* 11 F.3d 973 (10th Cir.1993); *United States v. Metallo,* 908 F.2d 795 (11th Cir.1990), *cert. den.* 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992). Here, the conspiracy charged in the indictment ended before the enactment of the sentencing guidelines. Consequently, Petitioner's invocation of 28 U.S.C. § 994 is merely a "red herring." Therefore, Petitioner's double jeopardy claim fails and Mr. Pungitore is not entitled to resentencing.

## C. Sixth Amendment Claims

Petitioner raises three different Sixth Amendment claims through his § 2255 motion. First, he argues the he was constructively denied effective assistance of counsel due to a conflict of interest that was created by threats levied against his trial attorney by the Petitioner's co-defendants. Second, Petitioner claims that his trial attorney was ineffective due to his actions and inactions at trial. Finally, Mr. Pungitore asserts that Mr. LaCheen was ineffective in plea bargaining. Petitioner raises some extremely serious allegations in support of these arguments. Yet, in the end, each of Petitioner's Sixth Amendment claims must fail.

### 1. The Law of Ineffective Assistance of Counsel, Constructive Denial of Counsel, and Conflict of Interest

#### a. Ineffective Assistance of Counsel

 The right to have the assistance of counsel is provided for by the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the Supreme Court; it cannot be denied to a defendant absent intentional and actual waiver. *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Supreme Court has set out a two-prong test to establish a claim of ineffectiveness of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner must show both that: (1) his counsel's conduct was deficient, falling "outside the wide range of professionally competent assistance," and (2) he was prejudiced as a result of that deficient conduct. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

 To satisfy the first prong, deficiency, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *Id.* at 690, 104 S.Ct. 2052; *Diggs v. Owens*, 833 F.2d 439, 444–45 (3d Cir.1987), *cert. denied*, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988)("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."). Furthermore, the mere fact that a tactic has been unsuccessful does not necessarily indicate that it was unreasonable. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

To guide us in determining the reasonableness of an attorney's performance, the Supreme Court in *Strickland* noted that the American Bar Association Standards may be referred to as a guideline. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *See also, Government of the Virgin Islands v. Weatherwax ("Weatherwax I")*, 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II")*, 77 F.3d 1425, 1435 (3d Cir.1996), *cert. denied*, ─── U.S. ───, 117 S.Ct. 538, 136 L.Ed.2d 423 (1996).

 One of the most relevant standards in this context is ABA Standard for Criminal Justice § 4–5.2 (3d ed.1993), "Control and Direction of the Case." This section dictates which decisions are ultimately to be made by the defendant and which are to be made by the defense counsel. Specifically, strategic and tactical decisions such as which witnesses to call, whether to conduct cross-examination, and what trial motions to make are within the province of the attorney after consultation with the client. ABA Standard 4–5.2(b). The Commentary thereto states that when the attorney in question makes such strategic or tactical decisions, "[o]nly when [his] behavior reveal[s] ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel." *Weatherwax I*, 20 F.3d at 579, *citing* Commentary at 4.67–68. Therefore, if a decision falls within the realm of "strategic decisions" to be made by the attorney, we

will find whatever decision that attorney made to be sufficiently deficient *only* if he either failed completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound.

If the first prong is proven, a petitioner must also prove the second prong, prejudice. To prove prejudice, a petitioner must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal*, 10 F.3d at 104, *citing Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

However, this two pronged approach to ineffective assistance of counsel does not apply in all Sixth Amendment situations. Petitioners are freed from having to prove actual prejudice in two specific types of Sixth Amendment cases: situations were a defendant has been constructively denied counsel and situations where a defendant's attorney has labored under an actual conflict of interest.

### b. Constructive Denial of Counsel

The concept of constructive denial of counsel has been recognized by the Supreme Court in both *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052, and *United States v. Cronic*, 466 U.S. 648, 658–660, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). What makes constructive denial of counsel different from the run of the mill ineffective assistance of counsel case is that prejudice is presumed. *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039. *Cronic* documents three situations where constructive denial of counsel may arise: (1) where counsel is denied completely, (2) where "counsel entirely fails to subject the prosecution's case to a meaningful adversarial testing," and (3) where circumstances dictate

that "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." 466 U.S. at 659–60, 104 S.Ct. 2039. The paradigmatic example of the last situation is *Powell v. State of Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), otherwise known as the Scotsboro trial, where the "defendants, young, ignorant, illiterate, surrounded by hostile sentiment ... charged with an atrocious [capital] crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within few moments after counsel ... began to represent them." *Id.* at 57–58, 53 S.Ct. 55. The Supreme Court has explained that there are two reasons why prejudice is presumed in constructive denial of counsel cases. First of all, "[p]rejudice in these circumstance is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. And second, "such circumstance involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." *Id.*

### c. Conflict of Interest

The conflict of interest standard has been held by some courts to be a species of the constructive denial of counsel. *See Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir.1997). While this may be the case (we do not feel it necessary to quibble over classifications), the Supreme Court has stated that conflict of interest cases warrant "a similar, though more limited presumption of prejudice," than afforded in traditional constructive denial of counsel situations. *Strickland*, 466 U.S. at 693. Prejudice in actual conflict of interest situations is not presumed, per se, but "is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an adverse conflict of interest adversely affected his lawyer's performance.'" *Id.* (*quoting Cuyler v.*

*Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

Of course, the above analysis of when prejudice may be presumed in actual conflict of interest cases begs the question: what is an actual conflict of interest? We have yet to find a definition of an actual conflict of interest, though this, of course, has not stopped courts from finding actual conflicts of interest to exist. *See Cuyler,* 446 U.S. at 356, n. 3, 100 S.Ct. 1708 (Justice Marshall dissenting)(" '[c]onflict of interests' is a term that is often used and seldom defined."). The Third Circuit has suggested that courts look to prevailing norms for guidance in determining what is an actual conflict of interest and has turned to the Model Code of Professional Responsibility ("Model Code") for guidance. *Government of the Virgin Islands v. Zepp,* 748 F.2d 125, 135 (3d Cir.1984). The Model Code "proscribes the representation of conflicting interests in order to avoid interference with counsel's fiduciary obligations to maintain undivided loyalty, to preserve attorney-client confidentiality and to assure competent representation for each client." *Id.* As *Zepp* elaborates, the Model Code

> requires that a lawyer exercise independent judgment on behalf of a client. DR 5–105 proscribes employment which may interfere with the lawyer's 'independent professional judgment' on behalf of another client. The Code does not specifically refer to 'conflicting' interests, but describes the problem in EC 5–14 as concerning clients who have 'differing interests,' whether such interests be 'conflicting, inconsistent, diverse or otherwise discordant.' The Code's prohibition focuses upon the relationship between the clients, that is differing interests which may affect the independence of the attorney's professional judgment. Mallen and Levit, Legal Malpractice 241 (2d ed.1981).
>
> *Id.*

■ Our Court of Appeals has pointed out that "[t]he typical conflict of interest cases giving rise to claims of ineffective assistance of counsel involve multiple representation of clients...." *Zepp,* 748 F.2d at 135. Yet, these are not the only situations where an actual conflict may arise. An actual conflict of interest may also exist when " 'during the course of the representation, the defendants' interests diverge [from their counsels'] with respect to a material factual or legal issue or to a course of action.' " *Id.* at 136 (*quoting Sullivan v. Cuyler,* 723 F.2d 1077, 1086 (3d Cir.1983)("*Sullivan II* ")). Thus, the Third Circuit has found that an actual conflict existed when defense counsel faced potential criminal liability on the same charges for which the defendant was tried and also acted as a prosecution witness. *Id.* at 135–139. Yet, there are few, if any, situations beyond those posed by *Zepp* (attorney under investigation for role in client's crime) and *Sullivan II* (representation of multiple defendants) where the Third Circuit has found an actual conflict of interest to exist. And, there are no cases that we are aware of, either in this circuit or any other, where a court has found an attorney to have a conflict of interest with his client because of intimidation levied by one of the client's criminal associates. Thus, though we are surprised that this issue has not been raised before, Petitioner's argument that his co-defendants' threats created a conflict of interest between him and his attorney seems to be an issue of first impression.

### 2. Petitioner was Not Constructively Denied Counsel Due to a Conflict of Interest with Mr. LaCheen

Petitioner argues that he was constructively denied counsel due to an actual conflict of interest with his attorney. This alleged conflict was the result of threats supposedly made against Mr. LaCheen by Petitioner's fellow co-defendants—specifically Leonetti and Scarfo. Petitioner claims that the threats against his attorney affected Mr. LaCheen's entire representation—including his decisions regarding negotiating a plea, calling witnesses, making appropriate objections and pressing for a severance. *See Petitioner's Supplemental Memorandum* at 8; *Petitioner's Reply* at 9. Since Petitioner is basing his claim on an actual conflict of interest, he must demonstrate that Mr. LaCheen " 'actively represented conflicting interests' and that 'an adverse conflict of interest adversely affected his lawyer's performance.' " *Strick-*

*land,* 466 U.S. at 693, 104 S.Ct. 2052 (*quoting Cuyler,* 446 U.S. at 348–50, 100 S.Ct. 1708).

However, before we can examine whether a conflict of interest existed between Petitioner and his counsel, we must first examine, in detail, Mr. LaCheen's testimony at Petitioner's § 2255 hearing. Only then will we be equipped to determine whether a conflict of interest did, in fact, exist.

### a. Mr. LaCheen's Testimony

The bulk of Petitioner's § 2255 hearing on May 13, 1998 consisted of the testimony of his trial attorney, Stephen LaCheen. *See Tr. 5/13/1998* at 23–185. We had an ample opportunity to hear this testimony and observe the demeanor of Mr. LaCheen. We find most, but not all, of his testimony to be credible. We credit the following testimony:

Mr. LaCheen testified that he is 63 years old and has been practicing criminal law for the better part of 41 years. *Id.* at 90. Mr. LaCheen has been a highly regarded defense attorney. Martindale Hubbell gives Mr. LaCheen an "A" rating. *Id.* at 92. Mr. LaCheen is on the editorial board of the Philadelphia Lawyer Magazine. *Id.* In 1997, Mr. LaCheen was president of the American Board of Criminal Lawyers. *Id.*

Over the years, Mr. LaCheen has handled thousands of criminal cases, including the Petitioner's. *Id.* His clients included accused murderers, rapists, drug dealers, "white collar criminals", and a few alleged mobsters. Mr. LaCheen acknowledged that he believes there is a mob in Philadelphia, and he was familiar with the type of crimes the mafia was identified with, including crimes of violence, such as murders. *Id.* at 92–96. Mr. LaCheen has defended a few death penalty cases. He has accepted court appointments over the course of his career and believes he is still on the appointment list, although he has not taken many appointments recently. Mr. LaCheen has represented many private clients who retained him. He has also represented lawyers accused of crime, including Robert F. Simone, Esq., his co-counsel in the Scarfo RICO prosecution. He defended Simone in federal court in New Jersey in the mid 1980's, when Simone was prosecuted for perjury. Later, in the early 1990's, he represented Simone in what he recalled to be a motion to obtain a parole hearing following Simone's conviction in the Eastern District of Pennsylvania for RICO violations stemming in part from the Rouse extortion. *Id.* at 97–99.

Stephen LaCheen had experience in joint trials with other counsel involved before Petitioner's case. More specifically, he had defended accused criminals in joint trials in which Simone was his co-counsel. One such case many years ago was the case of Junior Staino [8] and Lillian Reis. Another such case was the 1987 Philadelphia Court of Common Pleas prosecution of Scarfo, Mr. Pungitore and six or seven of Mr. Pungitore's other RICO co-defendants in what is commonly known as the Salvatore Testa murder case. *Id.* at 100–04.

Mr. LaCheen acquired Joseph Pungitore as a client in the mid–1980's on a referral from Robert Simone. Initially, Mr. LaCheen agreed to represent Mr. Pungitore in a State of New Jersey bookmaking prosecution; however, the indictment was soon superseded, and Petitioner was charged with violations of the state RICO statute. Thereafter, Mr. Pungitore was indicted in the Testa murder case. Mr. LaCheen represented him in that case, as well. Finally, Petitioner was indicted in the instant RICO action in the Eastern District of Pennsylvania. As noted, Mr. LaCheen's office entered an appearance two days after the January 11, 1988 indictment. Mr. Pungitore was a paying client who privately retained Mr. LaCheen. Although he did not recall how much he was paid, Mr. LaCheen acknowledged that it was probably somewhere in the vicinity of, but less than $100,000. *Id.* at 101–04.

Mr. LaCheen entered the instant case within hours after the indictment. A glance at its first page shows that there were eighteen co-defendants. Absent non-trial dispositions or the granting of a severance motion,

---

**8.** Philadelphia La Cosa Nostra soldier Ralph Staino, Jr., also known as Junior Staino, was Pungitore's co-defendant in the instant RICO case. The case to which LaCheen alluded involved the same felon, but a different felony.

which is unusual in this type of conspiracy case, the likelihood that he would be participating in a joint trial had to be more than obvious to Petitioner's counsel. Mr. La-Cheen had participated in joint trials in the past and understood full well that they required substantial accommodation of the varying styles and tactics of the defense lawyers involved. *Id.* at 130.

Although Mr. LaCheen filed a severance motion for his client on June 30, 1988, the motion was generalized in nature and never addressed the issue of possible spillover prejudice from testimony that might implicate lead counsel Simone in the Rouse extortion. This was because Simone was Scarfo's attorney of choice. It was obvious that he would be the lead counsel in the trial, and there was strong feeling against filing a severance motion. *Id.* at 30–32, 75–77. Mr. LaCheen said he knew who and what Scarfo and Leonetti were, and he did not think it advisable for his client to appear unwilling to go to trial with Scarfo when he, Scarfo and the other co-defendants were being held in the same jail without bail. *Id.* at 117–18, 148. No other defendant joined in Petitioner's severance motion, and all disavowed it.

Clearly, the die was cast at the July 7, 1988 pre-trial conference for the employment of a joint defense strategy with Simone as lead counsel. Mr. LaCheen voiced no disagreement. Knowing all of these things, Mr. LaCheen never returned his fee, never moved to withdraw (although several counsel did withdraw before trial began in September, 1988), and proceeded to prepare for what promised to be a lengthy joint trial subject to the strategic guidance of Robert Simone.

Mr. LaCheen testified that he agreed to participate in the joint defense strategy. He understood that it was not a democracy and everybody else—the defendants and the defense lawyers, many of whom were very capable and had substantial reputations—went along with it. The defense was "to attack

the rats" and suggest to the jury that the government was unreasonable in asking any jury to find the defendants guilty beyond a reasonable doubt on the testimony of such unsavory characters. The same defendants had gotten across the board acquittals in two previous prosecutions tried within the preceding twelve months with Simone as lead counsel spearheading this very strategy and demolishing the principal cooperating government witnesses Del Giorno and Caramandi.[9] *Id.* at 122–24.

Mr. LaCheen and Robert Simone had very different courtroom styles. Mr. LaCheen knew this from his own experience. He had seen Simone in action and tried cases with him by the summer of 1988 when he agreed to pursue the joint defense strategy. Simone believed in trying cases with a view to what would be attractive to a jury and what would annoy it. Consequently, he was loathe to object, reasoning that if he objected, the jury would believe that the testimony must have really hurt his client. On the other hand, if he did not object, he believed it would be easier to persuade the jury that the testimony did not hurt. *Id.* at 38, 46. Mr. LaCheen's style was to object much more frequently, and he knew Simone probably considered him a "nitpicker." *Id.* at 145–47. Additionally, Simone urged decisions on the basis of what would be good for the group of defendants as a whole, rather than what might help an individual defendant. Consequently, he urged against calling alibi and character witnesses. *Id.* at 35–38. Petitioner's counsel did not particularly like the way the case was being tried, but many other reputable lawyers did, and it was difficult to quarrel with the recent stunning success of Simone's approach. Consequently, influenced by peer pressure, Mr. LaCheen went along. *Id.* at 30–32, 144. Mr. LaCheen testified that some lawyers had to get permission from Simone to cross-examine witnesses in given areas, but he did not recall this happening to him. *Id.* at 35–38, 49–50. To the contrary, Mr. LaCheen cross-examined

9. One prosecution was the CCE prosecution of Scarfo, Leonetti, and several other mobsters in Eastern District of Pennsylvania Criminal No. 87-00258. All of the defendants who proceeded to trial were acquitted in this case in December, 1987. The second was the Testa murder prosecution in the Court of Common Pleas of Philadelphia which resulted in acquittal of all defendants in May, 1988.

Del Giorno, Caramandi, Madgin and any other witnesses who had anything to say specifically about Pungitore. When asked if he participated substantially in the trial, Mr. LaCheen replied: "absolutely." He acknowledged that he gave the second or third longest defense summation and expressed the view that it was certainly the best. *Id.* at 130–31.

Both Petitioner and his counsel actively chose to pursue a joint defense strategy in this case. Indeed, September 9, 1988 provided Petitioner and Mr. LaCheen with several opportunities to disavow their adherence to the joint defense strategy, even after he had lost his severance motion, but none were seized.

Immediately after Petitioner's severance motion was denied, the government moved to disqualify Simone on conflict of interest grounds. If Simone were disqualified, Mr. LaCheen could have been in a position to defend Mr. Pungitore in a style more to his liking. Nonetheless, Mr. LaCheen went to sidebar with Simone and opposed the government's motion, stressing Simone's value to the defense team. Mr. LaCheen characterized Simone as "the one lawyer who knows not only about the case but [has] tried three of four cases before. He probably has more knowledge than the rest of us together...." Mr. LaCheen also vouched for Simone to the court, assuring the court that Simone would not inject his own credibility into cross-examination of witnesses like Del Giorno and Caramandi who might implicate Simone in the crimes they were describing. *Tr. 9/9/88* at 50, 47–48. If Mr. LaCheen did not believe that the joint defense strategy was viable, one would think he would have remained silent in the face of the government's motion, if not in fact joined it. Instead, he fought actively to keep Simone in the case as his co-counsel.

Mr. LaCheen's lionization of Simone was more than gratuitous flattery. As he admitted on cross-examination, there were good reasons why Simone's presence in the defense camp advantaged all the defendants. The defense team felt that the government was trying to get Simone out of the case because he was the best lawyer. He was the most experienced litigator in a group of experienced and excellent lawyers. He had intimate familiarity with the vulnerabilities of the key government cooperating witnesses. Moreover, Simone had a reputation as an excellent cross-examiner and as being a lawyer who was particularly good at ingratiating himself with juries. Further, he had a reputation as an orator capable of delivering stem-winding summations. *Tr. 5/13/98* at 120–21, 129.

Petitioner and his counsel had another opportunity to distance themselves from Scarfo and Simone when Simone presented the issue of potential temporary absence of some defense counsel from the trial. Simone asserted in open court that all the defendants and lawyers were working together as a team, and that all the defendants had agreed to permit their lawyers to leave the courtroom from time to time. The lawyers could be working on the case in the library or elsewhere. Simone did not want the case to be delayed by a series of waivers at every such occurrence. The court and Simone discussed the possibility of preparing a general written waiver. No one, including Mr. La-Cheen, objected. In fact, after the court and Simone agreed to look into the concept of a general written waiver, Mr. LaCheen offered his confirmatory "Amen" by stating: "That's what I wrote down, a written general waiver." *Tr. 9/9/88* at 59–62. Thus, Mr. La-Cheen expressed his agreement to pursue the joint defense strategy in this unsolicited expression of support for the concept of team representation. A few days later, on September 13, 1988, a written general waiver was presented by the defense team to the court and entered of record. Both Petitioner and his attorney signed it. *Tr. 5/13/98* at 130.

On the face of the record, there can be little doubt that Mr. LaCheen willingly, if not totally enthusiastically, decided to cast his client's lot with his co-defendants and pursue the joint defense strategy. Certainly, through the beginning stages of the trial he was comfortable with this strategic choice which was embraced by the other defense lawyers in the case, most of whom Mr. La-Cheen characterized as excellent attorneys

whose judgment he respected. If Mr. LaCheen's misgivings with the joint defense strategy grew as the case went on, they never grew to the point that he renewed his motion to sever or moved to withdraw.

Mr. Pungitore essentially contends now that his attorney, Stephen LaCheen, was threatened and intimidated by Scarfo, Leonetti and Simone and, consequently, failed to take actions on his behalf that he would have taken had he not acted in a cowardly fashion. A careful reading of the record of the case shows that his charges are inaccurate and unfounded.

Initially, it should be noted that any threatening statements and actions referred to by Mr. LaCheen in his testimony are supposed to have occurred after the trial began. Thus, it is illogical to suggest that actions taken before then were the product of this alleged intimidation. For example, Mr. LaCheen's decision to seek a severance on general rather than spillover grounds predated the trial by two months. Likewise, during the summer of 1988 he prepared for a joint trial with Simone as lead counsel. His decisions to adhere to the joint defense strategy and not withdraw from the case could not have been influenced by any threats allegedly made by Leonetti months later.

We indicated earlier that we accept and credit the foregoing testimony. We have far more difficulty in crediting and accepting the testimony of Mr. LaCheen with regard to the alleged intimidation. Our findings are as follows:

We accept the testimony of Mr. LaCheen that the alleged threats by Leonetti were typically made in a joking fashion and usually were occasioned by what the rest of the defense team perceived to be Mr. LaCheen's excessive objections that deviated from the philosophy of the joint defense strategy. According to Mr. LaCheen, after one such objection, Leonetti told him that he had orders to kill him if he made another objection. *Id.* at 40–41. While this statement made him uncomfortable, it did not deter him from making more unwelcome objections. After another such objection Leonetti allegedly told Petitioner's counsel that one of the reasons he wanted to be acquitted was so that

he could give Mr. LaCheen and his client, Mr. Pungitore, a good beating when everything was over. But again, Mr. LaCheen stated that this statement was said in jest. *Id.* at 43–44. Mr. LaCheen noted that Leonetti had a penchant for drawing pictures of dead rats, for glaring at people, and for keeping hit lists of names of people who aroused his ire, placing check marks next to the names on the occasion of each offending incident. Yet, again Mr. LaCheen states that this was all done "jokingly." *Id.* at 39. While all of this made Mr. LaCheen uncomfortable, he testified: "Did I think they were going to kill me? No. Was it a concern? Yes." *Id.* at 45. Mr. LaCheen went on to say that although there was an atmosphere of intimidation that he sensed increasingly through the trial, "nobody ever came to me— except the one time Leonetti used the word, kill—nobody said, if you do this you're gonna get hurt, if you do that, you know, there's going to be some retribution." *Id.* at 55.

In view of the joking fashion in which any alleged threats were made, we do not accept or credit any testimony to the contrary that these threats were taken seriously by Mr. LaCheen. Our view is independently bolstered, as we will later discuss, by the professional actions of Petitioner's counsel.

In similar fashion, we do not accept Mr. LaCheen's testimony that as the trial went on, he became increasingly uneasy about the presence of Nicky Scarfo, Jr. in the defense attorney's conference room during breaks, and that he came to view him as a spy for his father. Mr. LaCheen testified that this presence made him more circumspect about expressing his views. *Id.* at 34. It would seem that any crucial information would have been relayed to Mr. Scarfo by his lawyer with or without the presence of a "spy." The lack of any real basis for concern is supported by Mr. LaCheen's testimony that he received no affirmation of his concerns from any co-counsel, whose professional judgment he respected. *Id.* at 40–41, 70.

If Mr. LaCheen did feel uncomfortable he nevertheless continued to try the case. He even went so far as to try to reinitiate guilty plea inquiries with AUSA Fritchey during

the testimonial part of the trial, despite Leonetti's public assertion that no one was going to plead guilty. This reflects that Mr. LaCheen pressed ahead with what he thought best for his client, regardless of what the effect might be on other defendants. Mr. LaCheen's devotion to his client is further demonstrated by his continued objections that aroused Leonetti's ire and which persisted even into the government's rebuttal summation.

The record will not support a finding that Petitioner's counsel failed to take a course of action in Mr. Pungitore's defense because of real concerns about Mr. LaCheen's personal safety. Similarly, we do not credit any testimony that Petitioner's counsel was reluctant to put on character or alibi testimony because of fear of retaliation. We believe that this decision was actually prompted by other common sense reasons related to trial strategy and the great weight of government evidence.

Furthermore, even if we were to accept this testimony, and we do not, it does not provide a legal basis for relief. According to Mr. LaCheen's testimony he chose not to call alibi and character witnesses, not because *Mr. LaCheen* feared that he would be killed, but because of Mr. LaCheen's fears for the safety of his client and *his client's family*. Thus, even if we were to accept Mr. LaCheen's testimony as true, Mr. LaCheen did not forbid the use of character and alibi testimony by the Petitioner. Rather, Petitioner's counsel testified that he told Mr. Pungitore that Petitioner should seek clearance to present this testimony. We are concerned with the actions of counsel, not the client.[10]

With respect to character and alibi testimony, Mr. LaCheen allegedly told Mr. Pungitore that he would do what he wanted: "tell me you're willing to face the consequences and I'll put it on." Mr. Pungitore put it off and never told LaCheen to go ahead with the character or alibi testimony. *Id.* at 61–64, 132–37, 141. Indeed, following the testimony of approximately ten defense

witnesses, Simone said to everyone, in our presence: "if anybody disagrees with me, raise your hand, I believe all the defendants would rest, is that correct?" No one responded, and the court noted: "That motion having been made all the defendants would rest." *Tr. 11/9/88* at 110–11. Not only did Mr. Pungitore not raise his voice to the court, he also gave no indication that he wanted to present testimony to his counsel. *Tr. 5/13/98* at 143–44. Thus, "no decision" on Mr. Pungitore's part became "a decision;" and, in any case, the failure to present character and alibi witnesses was not attributable to any intimidation of Mr. LaCheen.

As to the remaining assignments of ineffective assistance of counsel, we credit Mr. LaCheen's testimony that he made his objection to the government's rebuttal summation on vouching grounds, despite instructions from Simone not to object. Obviously, any accumulated intimidation from Simone, Scarfo and Leonetti did not prevent Mr. LaCheen even at the very end of trial from making what he thought was an objection that his sense of professionalism required him to make.

Mr. LaCheen's forbearance about cross-examining Caramandi about drug abuse cannot be laid to a response to intimidation either; rather it came from peer pressure of other lawyers who persuaded Mr. LaCheen to their view that it was best to leave the area alone. We credit Mr. LaCheen's best recollection that it was Joseph Santaguida, Esq., counsel for Frank Narducci, Jr., who persuaded him not to cross-examine in this area. *Id.* at 50.

As to not moving for severance on spillover grounds, we do not credit the testimony that Mr. LaCheen declined to take this course of action for much the same reason he did not buck the joint defense strategy by presenting character and alibi witnesses. We believe that Petitioner chose not to raise this issue because he wished to pursue the joint defense strategy which has proved amazingly successful in the past. And, even if we believed that the true reason Mr. LaCheen did

---

10. If we were to accept the testimony of Mr. LaCheen, and we do not, he could hardly be faulted for not advising his client to present

character and alibi testimony which may have resulted in severe retaliation against Mr. Pungitore by the mafia.

not raise the spillover issue was because he considered it unwise for his client to appear to not want to go to trial with Scarfo, *id.* at 117–18, this is not a legal basis for relief. Mr. LaCheen was still working in his client's best interest and we would not consider this advice to be unreasonable, under the circumstances.

The issue which most troubles this court, and which was explored in some depth during the § 2255 hearing, is, if there were alleged threats, why Mr. LaCheen failed to bring them to the attention of the court or anyone else. Indeed, Mr. LaCheen never reported any perceived threats to the Philadelphia Police Department, Pennsylvania State Police, FBI, or any other law enforcement organization. He did not report them to the prosecutors. More significantly, he did not bring them to the attention of this court or any other court—under seal or otherwise. He made no record regarding them. He never resurrected his severance motion. He never moved to withdraw. He never discussed the alleged problem with the Chief Judge or any other federal judge. *Id.* at 148–169. Mr. LaCheen now gives several purported explanations for why he kept his alleged concerns to himself.

One explanation Mr. LaCheen gave at the hearing was that he did not think bringing the matter to the attention of this court would help. To have done so would have required the making of a record. He claims that he would have looked foolish in the eyes of his peers and that the court would probably not have taken any action anyway. He testified as follows:

Oh, Judge, the co-defendant's glaring at me. Hello. How does that sound? . . . there's seventeen lawyers and seventeen defendants and everybody else is going—almost everybody else—is going along with the program and here comes Steve LaCheen to go to the Judge and say, Judge, Philip Leonetti is drawing pictures of dead rats and checking off my name on a thing.

*Id.* at 150.

Mr. LaCheen testified further along these lines:

I would have to have made a complete record in front of the Judge, who would have to interrupt the trial of seventeen defendants and seventeen lawyers and listened to me whining about what it was that I thought was happening and saw happening.

*Id.* at 169.

Mr. LaCheen also expressed the opinion that he would not have been successful given what he had to work with and what his allegations would have been. *Id.* at 158.

If real threats were present, Mr. LaCheen obviously could have filed a motion for relief under seal and sought an in camera hearing, if necessary. The combined efforts of the prosecutors and law enforcement community were sufficient to safeguard the jurors anonymity and protect numerous government witnesses throughout the lengthy trial process. We find, however, that Mr. LaCheen's testimony did not establish the existence of any real threats to him.

Absent any real threats, we would have to agree with Mr. LaCheen's testimony that "whining" to the court would have made him look foolish. Without question, the bluster, bravado and "trash talk" of criminals can be vexing and unpleasant. However, in the real world, experienced criminal lawyers are undeterred with such nonsense and go about the business of representing their clients. The record of this trial shows that Mr. LaCheen did exactly that. We find it hard to believe that Mr. LaCheen could have lasted in the criminal bar for as long as he has, much less achieved the reputation he has gained, if he had not developed the ability for ignoring such talk.

We find that none of the assignments of ineffective assistance of counsel resulted from any true intimidation of Petitioner's counsel. Any hearing before this court, during the course of the trial, would have inquired into what Mr. LaCheen had failed to do but for Leonetti's actions, and nothing substantial could have been mentioned. Mr. LaCheen could have said that he had second thoughts about his participation in the joint defense strategy, but by then the trial would have been well under way, and we would have required him to continue. The logical conclusion to be drawn is that an important

reason why Mr. LaCheen did not bring this alleged conduct to the court's attention is that it was ultimately trivial in that it did not have a significant effect on his performance. If Mr. LaCheen had truly been frightened for his safety, we are certain he would have had much more to tell the court than that Leonetti was making lists and drawing pictures of dead rats. Indeed, only now, in a § 2255 proceeding, has this conduct taken on magnified significance in Mr. LaCheen's mind.

The second explanation Mr. LaCheen now gives for not bringing the matter to anyone's attention during the trial is that he feared that doing so would only help the prosecution while making matters worse for his client. For ideological or other reasons, he did not want to help the prosecution. Making a record of the matter would have required him to point an accusatory finger at Philip Leonetti and, perhaps, make him a witness in an obstruction of justice case, Mr. LaCheen testified. He also testified that "whining" to the court might have led to mob retribution against Mr. Pungitore or his family. If Mr. LaCheen actually doubted that he would be accorded any relief from the court (and we will take him at his word), it appears that he had much to lose and little to gain. Petitioner, himself, apparently agreed with this assessment, inasmuch as he never asked Mr. LaCheen to bring these matters to the attention of the court or anyone else. *Id.* at 165–67. Under the circumstances, Mr. LaCheen did not provide substandard representation to his client in remaining silent.

Finally, Mr. LaCheen asserts that he was extremely distressed by what had gone on, but he did not know what to do about it. This assertion presents some credibility problems, to say the least. Given the length and breadth of experience that Stephen LaCheen has, there is no reason to believe that he did not know every one of his options in dealing with Leonetti's alleged conduct.

If Mr. LaCheen truly believed that Leonetti had so intimidated him that he was not providing professionally effective assistance for his client, it would have been his duty to advise the court, withdraw from the case, or take other appropriate action. The fact that he chose not to indicates his conviction that such was not the case. Additionally, Mr. LaCheen never returned Mr. Pungitore's fee and apparently feels no obligation to do so. He still regards himself as an ethical member of the bar who and continues to practice law. These facts, though circumstantial in nature, when coupled with an examination of the trial record, are consistent with our finding that Mr. LaCheen was not deterred by intimidation and provided effective professional representation for Mr. Pungitore at all times he represented him.

After listening to Mr. LaCheen on the stand, we do not believe that the attorney ever felt that he was in any real danger of being killed or harmed by any of the co-defendants. While the actions of co-defendants and co-counsel may have made Mr. LaCheen feel uncomfortable, there is a very real difference between feeling uncomfortable and feeling threatened. Mr. LaCheen's decisions were made out of concern for his client's best interests, not his own. We find that any decisions that Mr. LaCheen now regrets making or not making, were not the result of fear for his safety, but were the result of deciding to go along with the defense team strategy that had worked magic on a number of previous occasions.[11]

---

11. There is no reason to doubt LaCheen's sincerity in saying that he may never live long enough to overcome how he feels about Pungitore's trial. However, it is clear that his views are substantially colored by hindsight and that he deeply second-guessed his strategy in what in his mind must be one of the most disappointing trial defeats of his career, however predictable the result may have been given an objective evaluation of the evidence.

For example, Mr. LaCheen testified:
In retrospect, I can look back and say there were a number of other things, but every day, I thought—I believed that I was representing my client, but things add up and you realize—I realized, unfortunately, that it—it—there were things that should have been done that weren't done.
*Tr. 5/13/98* at 47.
He testified further about the constraints of the joint defense strategy:
And there were certain restrictions that were put on us by this entire combination of facts, this totality of circumstances, that did not permit me to do what now, I can look back and

### b. No Conflict of Interest Exists Under These Facts

■ Under these facts, we cannot conclude that Petitioner was constructively denied counsel because of a conflict of interest resulting from Mr. LaCheen's fear for his personal safety. As we have discussed above, we do not find that Mr. LaCheen ever honestly felt afraid for either his life or limb, nor do we believe that his performance was affected by what Mr. LaCheen characterizes as an air of intimidation. Therefore, even assuming that a conflict of interest could be created by threats levied against an attorney by his client's co-defendants, Petitioner has failed to show that Mr. LaCheen " 'actively represented conflicting interests' and that 'an adverse conflict of interest adversely affected [Mr. LaCheen's] performance.' " *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052 (*quoting Cuyler,* 446 U.S. at 348–50, 100 S.Ct. 1708). Therefore, Petitioner's conflict of interest argument must fail.

Indeed, this is not a case where Leonetti, Scarfo, or Scarfo, Jr. cornered Mr. LaCheen before trial one morning, stuck a gun to his head, and said that "if you question the next witness, I will kill you." And, even under these extreme circumstances we are uncertain on whether a court could find a conflict of interest sufficient to warrant a new trial. Indeed, if all it took was one serious threat against an attorney to overturn a guilty conviction, it would be nearly impossible to make any mafia (or any other violent gang) convic-

tion stick. All defendants would have to do to escape justice would be to threaten their co-defendants' attorneys, and they could then be entitled to endless new trials. Indeed, we would not put this tactic past an organization such as La Cosa Nostra. Still, this extreme situation has not been presented before this court. Therefore, we have no reason to address this complicated constitutional question at this time. We will allow that unenviable task to fall to another unfortunate court which actually has those facts presented to it.

In any case, the facts in Petitioner's case do not prove that he had a conflict of interest with his attorney which would require a new trial. Since the conflict of interest analysis does not apply to this case, we will next view Petitioner's allegations through the lens of traditional ineffective assistance of counsel.

### 2. Ineffective Assistance of Counsel

Petitioner claims that he is entitled to a new trial even under the traditional ineffective assistance of counsel standard. He claims that Mr. LaCheen was ineffective at trial for failing to call character witnesses, call alibi witnesses, make appropriate and timely objections to the government's closing argument, properly impeach Caramandi, argue for a severance based on prejudicial spillover, and properly plea bargain. Petitioner claims that the question which must be answered is "whether the deficiencies in representation undermine confidence in the ver-

---

say, boy, you know, something else should have been done.

*Id.* at 55.

Later, when being pressed about why he did not move to withdraw from the case if he was truly distressed about Leonetti's alleged conduct, Mr. LaCheen explained why he thought his client did not receive a fair trial:

I wasn't walking out on my client. I was going to try the case, the best way I could under the circumstances. I just think the circumstances were such that he was deprived of a fair trial. That's what this is all about. You want to turn it into me, apparently, but it's about whether or not there was a fair trial under the circumstances.... [I]t wasn't the Court that did it, it was the way in which the case was tried ...

*Id.* at 159.

Distilled to its essence, the real problem for Mr. LaCheen is not Leonetti's allegedly uncivil behavior, because ultimately Mr. LaCheen was

undeterred by it, as any criminal lawyer worth his salt should be. The real gnawing problem that haunts him is that he agreed to join in the joint defense strategy, and while his misgivings about it increased as the trial continued, he had committed himself and his client to a specific course of action from which they could not retreat readily. The passage of time has only intensified his belief that he made a terrible mistake in agreeing to this. However, as *Strickland* teaches, the Sixth Amendment contemplates many alternative strategies and styles that can be employed in any given case, and professional effectiveness cannot be evaluated with the benefit of hindsight; rather, it must be assessed on the basis of the circumstances as they appeared to the attorney at the time. When Mr. LaCheen says Mr. Pungitore did not receive a fair trial, he makes that declaration generically under *his* own standard. Under the standard adopted by the Supreme Court in *Strickland* his representation was more than adequate.

dict," and posits that the "answer borders on the obvious." *Petitioner's Supplemental Memorandum* at 18. However, as we discussed earlier, there are actually two questions this court must consider: (1) was Mr. Pungitore's counsel's conduct deficient, falling "outside the wide range of professionally competent assistance," and (2) was the Petitioner prejudiced as a result of that deficient conduct? *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *DeRewal*, 10 F.3d at 104. After examining Petitioner's claims in light of these two questions, we agree with Mr. Pungitore that the answer to the question, "was Petitioner denied effective assistance of counsel," borders on the obvious. Petitioner in no way was denied his right to counsel guarantied by the Constitution.

### a. Character Witnesses

Petitioner's attorney was not ineffective for choosing not to call character witnesses. Petitioner does not even state what character witnesses his counsel should have called. Thus, his bald allegations are merely conclusory and cannot stand.

Petitioner's argument must also be deemed meritless since he has not shown any prejudice by the absence of character witnesses. We noted earlier that we did not credit any testimony that Petitioner's was reluctant to put on character or alibi testimony because of fear of retaliation. We believed rather that this decision was prompted by common sense reasons related to trial strategy and the great weight of government evidence.

Furthermore, while presentation of character testimony may have a substantial impact in some cases, presentation of character testimony in Mr. Pungitore's case would have been of little utility. The volume of irrefutable electronic surveillance evidence against the Petitioner was so great that character witnesses could scarcely make a difference to a jury that heard Mr. Pungitore in the midst of directing the various criminal operations under his control. Therefore, we can only characterize Petitioner's argument that Mr. LaCheen was ineffective for failing to present character testimony as frivolous.

If we were to credit the testimony to the effect that counsel was reluctant to put on character testimony because of fear of retaliation, there still would be no legal basis for relief. Mr. LaCheen testified that his decision not to call character (and alibi) witnesses was made after consulting with his client. Mr. LaCheen told Petitioner that he would do what he wanted regarding character witnesses: "tell me you're willing to face the consequences [of putting forth character witness testimony] and I'll put it on." Petitioner put it off and never told Mr. LaCheen to go ahead with the character or alibi testimony. *Tr. 5/13/98* at 61–64, 132–37, 141. The decision to not present character and alibi testimony was well within the ambit of reasonable professional representation. Important strategic and tactical decisions should be made only after a lawyer consults with his client. *ABA Standards* § 4–5.2(b); *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. A client's views and desires concerning the best course to be followed are relevant considerations that must be evaluated and taken into account by counsel. *Government of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1436 (3d Cir.1996). Mr. Pungitore cites no case that holds that the Sixth Amendment requires an attorney to insist that his client pursue the strategy he thinks provides the marginally higher chance of acquittal, where that strategy might reasonably provoke extra-legal retribution by the client's criminal cohorts. Courts have declined to characterize counsel's performance as ineffective, where counsel acted according to the defendant's restrictions on strategy. *See, e.g., Payne v. United States*, 78 F.3d 343, 346 (8th Cir.1996)(counsel's failure to present alternative defense strategy not ineffective assistance when both counsel and defendant decided to "try and win the whole ball of wax" by pursuing "snitch strategy").

### b. Alibi Witnesses

Petitioner's attorney was also not ineffective for choosing not to call alibi witnesses. Petitioner claims that he

> lost the right to call alibi witnesses who would have testified that Mr. Pungitore was with Mr. Tursi paying cash for a charcoal gray Jaguar the same time the Gov-

ernment witnesses alleged he was murdering Robert Riccobene. At the evidentiary hearing, the Government submitted a New Jersey Vehicle Registration purporting to establish the Jaguar was green and not charcoal gray, all in an effort to show that the alibi witnesses were mistaken. Attached hereto is proof that the Jaguar was gray, and that it is the Government's witnesses that are mistaken [Exhibit "A"]. If [the] Government had engaged in the same tactics to discredit the alibi witnesses at trial, maybe the jury would have drawn the inference that if the Government witnesses were as mistaken about other events as they were about Joseph Pungitore's role in Robert Riccobene's murder, then Joseph Pungitore deserved an acquittal. Maybe the jury would have wondered if the Government could make a mistake about the color of the Jaguar, it could be mistaken about the rest of the evidence against Joseph Pungitore.

*Petitioner's Supplemental Memorandum* at 18.

First of all, we do not credit the testimony that alibi witnesses were not called because of fear of retaliation. We find that Mr. LaCheen's determination not to call alibi witnesses, just like his decision not to call character witnesses, was a valid tactical trial decision. Second of all, Petitioner has failed to show any real prejudice. Presentation of his proposed alibi, even if accepted by the court, would not have even precluded Petitioner's conviction for Racketeering Act # 11, as there was ample evidence of his participation in the Riccobene War in general, including the conspiracy to kill Robert Riccobene. Simone's tactical objections to presenting fragmentary alibi testimony in a complex RICO prosecution involving numerous RICO predicate acts are also well reasoned. The reasonable probability that presentation of the alibi would have altered the verdict or other-

wise created questions about the justice of the proceeding is virtually nil.[12] Furthermore, given the mountain of evidence presented against the Petitioner, his argument that the jury might believe that the government was mistaken about the rest of the evidence against the Petitioner because it was mistaken about the color of a Jaguar is simply frivolous.

### c. Objection to Government's Closing

Petitioner argues that his attorney was ineffective for failing to object to the government's vouching for its witnesses immediately when it occurred during the prosecution's rebuttal argument. This argument has been raised by a number of Petitioner's co-defendants and helps Mr. Pungitore no more than it helped them. *See United States v. Merlino*, 2 F.Supp.2d 647, 664–64 (E.D.Pa. 1997); *United States v. Ciancaglini*, 945 F.Supp. 813, 824 (1996).

Petitioner makes reference to both the government's closing, in which the government discussed Mr. DelGiorno's and Mr. Caramandi's credibility, and the government's rebuttal, in which they discussed the credibility of the law enforcement personnel who had testified. Generally, it is improper for a prosecutor to vouch for the veracity of a government witness. "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981)(*citing Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)). We have reviewed the entire transcript of the government's closing, and can find no vouching whatsoever in reference to Mr. Caramandi or Mr. DelGiorno. The pros-

---

**12.** Mr. Pungitore failed to meet his burden of proof that he could have actually presented testimony that would have constituted a viable if limited alibi defense for his alleged crimes on the night of December 6, 1983. He never presented live testimony, but only an undated investigator's report that amounts to hearsay. Moreover, the report itself suggests that Mr. Pungitore was involved in buying a $30,000 plus gray Jaguar for cash, while state documents from the State of New Jersey suggest that the car purchased that night was green. Petitioner submits still further hearsay documents with his supplementary memorandum of June 13, 1998 to prove that the car was gray. Suffice it to say that these documents are *de hors* the record and irrelevant in any case, inasmuch as Petitioner failed to meet his burden of proof.

ecutor merely argued the evidence in the record; he did nothing improper. Since there is absolutely no evidence that any perjury was committed, or that the government had knowledge thereof, reference to the testimony of the government witnesses in closing is entirely appropriate.

We have also reviewed the government's rebuttal. Petitioner references the Third Circuit's opinion in *Pungitore*. The Court of Appeals did note that there were portions of the rebuttal summation in which the prosecutor "attempted to bolster the credibility of testifying law enforcement personnel and the prosecutorial team by invoking facts which had no foundation in the record." *Pungitore*, 910 F.2d at 1125. The Court went on to state that the defendants had not preserved their objections for appeal, and therefore, the *per se* error rule delineated in *United States v. DiLoreto*, 888 F.2d 996 (3d Cir.1989), could not apply.[13] Mr. Pungitore seems to argue that Mr. LaCheen's failure to object in a timely manner constituted deficient assistance.

 However, we note first that the *per se* error rule in *DiLoreto* was overruled by the Third Circuit in *United States v. Zehrbach*, 47 F.3d 1252 (3d Cir.), *cert. denied*, 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995)("the *per se* reversal standard announced in *DiLoreto*, however, conflicts with the Supreme Court case law requiring the court to analyze prosecutorial comments case by case, in the context of the entire trial, and reverse only where the defendant has suffered prejudice."). As a result, Mr. LaCheen's failure to object is not inherently error. Instead, the prosecutor's comments in the rebuttal summation must first be reviewed pursuant to the harmless error doctrine to determine if the defendant received a fair trial before we can decide if it was unreasonable to not object. *Id.* at 1267.[14]

The Third Circuit has already held that the comments made in this case by the prosecutor in rebuttal were an "invited response." *Pungitore*, 910 F.2d at 1123. The Third Circuit further explained this kind of issue in *United States v. Pelullo*, and noted that

> where there is no foundation for the defendant's assertions, the prosecutor will undoubtedly feel the need to respond during rebuttal which often leads to improper vouching as to the credibility of witnesses or to the prosecutor's own integrity or that of his or her office. Where the defense has made improper remarks, the "reply" or "invited response" doctrine permits the prosecution to attempt to neutralize the remarks, so long as he or she does not use the defendant's accusation as a springboard affirmatively to attack the defense.

964 F.2d 193, 218 (3d Cir.1992); *See United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

In the instant case, the unified defense strategy focused on attacking the credibility of all of the government witnesses and the credibility of the numerous law enforcement officers involved. The Third Circuit recounted in *Pungitore* the various defense closings and stated

> [defense attorney Simone] analogized the prosecution of the Scarfo family to the government's attempt to bury unions in the 1930's, the interment of the Japanese during World War II, the blacklisting of communists during the McCarthy era, the circumstances leading to the Kent State riots, the persecution of Vietnam protestors, and ultimately, in his *piece de resistance*, to the Spanish Inquisition.

*Pungitore*, 910 F.2d at 1122.

The defendants, in several different closings, clearly suggested that the law enforcement personnel had fabricated testimony against the defendants. The rebuttal state-

---

13. Mr. LaCheen did try to object to the vouching in the prosecution's rebuttal, but the Court of Appeals held that Mr. LaCheen's objection came too late. *Pungitore*, 910 F.2d at 1126, n. 58.

14. Petitioner cites *Senk v. Zimmerman*, 886 F.2d 611 (3d Cir.1989), for the proposition that ineffective assistance of counsel is measured against the law in effect at the time of trial and therefore

the fact that *DiLoreto* was overturned has no significance. We disagree. *Senk* is readily distinguishable from the instant case. *Senk* merely held that a petitioner could not base an ineffective assistance of counsel claim on a case that was not decided until 17 years after the conclusion of the petitioner's trial. *Id.* at 613–616.

ments of the prosecutor, while zealous, were made only in response to the defendants' collective allegations, and were therefore not improper under the circumstances.

Since the government's comments in closing were not improper vouching, Mr. LaCheen's failure to timely object is not deficient conduct. Indeed, we would be hard pressed to find Mr. LaCheen's counsel to be ineffective, when Mr. LaCheen at least tried to object to the vouching (albeit a little too late), when we have already found the conduct of co-defendants' attorneys, who did not object at all, to be proper.

### d. Impeachment of Caramandi

■ Mr. Pungitore complains that his attorney was ineffective for failing to impeach the credibility of cooperating government witness Nicholas Caramandi, a former soldier in the Philadelphia La Cosa Nostra family by cross-examining him about his alleged past use of illegal drugs. According to the testimony of Mr. LaCheen, the defense lawyers agreed as part of the joint defense strategy to avoid cross-examination in this area because there was fear that Caramandi would say that he used drugs with lead attorney Robert Simone. Mr. LaCheen had some difficulty recalling which of his fellow attorneys cautioned him in this area, but he believed it was Joseph Santaguida, Esq., counsel for Frank Narducci, Jr. Petitioner's counsel said he went along with this strategy and did not cross-examine in the area, but he would have done so had Petitioner's trial been severed. *Tr. 5/13/98* at 50.

First of all, the basis for cross-examining Caramandi about past drug use was never established by Petitioner at the § 2255 hearing. On the other hand, Mr. Caramandi had a remarkably sordid past that provided virtually limitless cross-examination material. He was a life-long felon who had participated in a murder and various murder conspiracies. He had been involved in numerous frauds, thefts and swindles. He engaged in widespread extortions over a long period of time. Additionally, he had been placed in protective custody and apparently lied about his living conditions in such custody in another trial, making them sound more onerous than

they were. Moreover, he hoped to receive a lenient sentence in return for his cooperation, and considerable government funds had been expended on his security. On top of everything else, he became flustered at one point during cross-examination and accused Simone and Scarfo of planning to kill him. He was obliged to retract his accusation of Simone in front of the jury. If all of this was not enough to impeach his credibility, we cannot imagine how past drug usage would make a difference.

The record shows that Caramandi was cross-examined for several days by a host of defense attorneys, including Mr. LaCheen, who asked pertinent questions that helped his client. Declining to cross-examine Caramandi about past drug use was certainly not substandard representation under the circumstances, and Petitioner was not prejudiced by the absence of such cross-examination. This ineffective assistance of counsel argument therefore fails.

### e. Severance

Petitioner claims that his counsel was ineffective for failing to ask the court to sever the trial based on Leonetti's threats and on prejudicial spillover. This issue was never raised in Petitioner's original § 2255 motion. It was not an issue at the May 13, 1998 hearing and cannot properly be raised for the first time in a post-hearing memorandum of law. In any case, the claim is meritless.

Mr. LaCheen did not raise the issue pretrial, because he and his client were satisfied to pursue the joint defense strategy for reasons stated above. Furthermore, Mr. LaCheen could not have asked for a severance before trial based on Leonetti's alleged threats because those alleged threats were not communicated until the trial was well under way.

■ Had Mr. LaCheen renewed his motion for a severance late in the trial alleging spillover as a new ground, the likelihood that his motion would have been granted is nil. Petitioner, like most of his co-defendants in their § 2255 proceedings, has grossly overstated the alleged prejudice flowing from "spillover." Mr. Pungitore and other co-de-

fendants raised the spillover argument on direct appeal and did not noticeably impress the Court of Appeals. *Pungitore*, 910 F.2d at 1143, n. 85 ("it is difficult to conclude that there is a prejudicial spillover where there is substantial independent evidence of a defendant's guilt"). Indeed, had Petitioner asked for a severance based on spillover, we still would never had granted it. Therefore, Mr. LaCheen's failure to ask for a severance on this basis cannot be deemed ineffective assistance of counsel.

### f. Plea Bargaining

█ Petitioner cites the second circuit case of *Boria v. Keane*, 99 F.3d 492 (2d Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997), to stand for the proposition "that a criminal defense lawyer must take steps to persuade a criminal defendant otherwise unwilling to plea bargain where standing trial would be suicidal." *Pungitore's Supplemental Memorandum* at 16. Apparently Petitioner believes that his lawyer, due to Leonetti's threats, was unable to take the steps necessary to persuade him to negotiate a guilty plea with the prosecution. Frankly, we find this argument to be preposterous.

First of all, *Boria* is not the law of this circuit. Petitioner cites to no cases within the Third Circuit where a lawyer has been found to be ineffective for failing to take steps to persuade a client to plead guilty.

Second, even though the government had amassed a great deal of evidence against the Petitioner, this still was not a case, like *Boria*, where "standing trial would be suicidal." *Petitioner's Supplemental Memorandum* at 16. Indeed, Petitioner had some very good reasons for wanting to go to trial. He was facing an extremely stiff sentence if he was adjudged guilty. And, the joint defense strategy used by the Petitioner in this case had proven successful on a number of other occasions. *See Merlino*, 2 F.Supp.2d at 655.

█ Finally, Petitioner's argument collapses because it is simply not supported by the facts of this case. To make a successful claim that trial counsel failed to provide adequate advice to allow a defendant to make an intelligent plea bargaining decision, the defendant bears the burden of proving that counsel's advice was below acceptable professional standards, and he must also prove prejudice in fact. Thus, the defendant must prove that the government actually extended a plea offer and must demonstrate a reasonable probability that: (1) the defendant would have accepted the alleged plea offer, (2) the court would have accepted the plea agreement, and (3) a lesser sentence would have resulted. *United States v. Day*, 969 F.2d 39, 44–45 (3d Cir.1992).

Petitioner has failed to show either that there was a plea bargain offer on the table for the Petitioner to accept or that there was a reasonable probability that the defendant would have accepted the alleged offer. At the § 2255 hearing Mr. LaCheen admitted that there were only very preliminary discussions about a plea that he, himself, initiated, that there was never a plea agreement, or anything even close to one. Mr. LaCheen also acknowledged that any plea discussions were with either police officer Friel, who had no authority in this case whatsoever, or with AUSA Fritchey, who did not have the authority to negotiate a plea on his own. *Tr. 5/13/1998* at 172–181. The evidence produced at the hearing conclusively showed that there never was any guilty plea on the table for Petitioner to accept or for his attorney to advise him about. At best, according to Mr. LaCheen, "we didn't get that close.... These were preliminary discussions, is what they were." *Id.* at 176. These preliminary discussions most certainly never rose to the level of a plea agreement. Petitioner has therefore failed to show that the government ever extended a plea offer, as required under *Day*.[15]

---

**15.** The government, in its answer, vigorously denied that Petitioner had ever been offered a plea agreement at all, let alone one that would have limited his incarceration to 20 years. Petitioner attacks the government's response, characterizing it as a violation of the witness-advocate rule.

First of all, Petitioner has failed to produce any credible evidence that a plea agreement was ever on the table. Thus, the government need not even respond to this allegation. Second, we do not find the government's response that it never put a plea bargain on the table to be a violation

Furthermore, even given the preliminary nature of the plea discussions, Petitioner presented no evidence that the United States would have accepted an plea that did not involve cooperation. *See Tr. 5/13/1998* at 176–177. And, even if the government would have accepted a plea agreement that did not involve cooperation, we can definitively say that this court would never have accepted such an agreement. Petitioner has presented no evidence that he would have accepted a plea which involved cooperation. Therefore, Petitioner has failed to show a reasonable probability that he would have accepted any offer that the government might have even considered making. Petitioner's claim that his counsel was ineffective at plea bargaining is completely without merit and fails when subjected to any scrutiny.

### IV. CONCLUSION

Despite some very creative arguments and testimony, we find Mr. Pungitore's § 2255 motion to be groundless. Mr. Pungitore was not denied his rights under the Fifth Amendment. Petitioner's sentence did not violate double jeopardy, nor were Mr. Pungitore's rights violated by either the court's reasonable doubt instruction or the government's alleged failure to turn over *Brady* material. Furthermore, Mr. Pungitore's Sixth Amendment rights were never violated. Petitioner was not constructively denied counsel through a conflict of interest with his attorney. And, Mr. LaCheen's representation of the Petitioner cannot be deemed ineffective. No reason exists for this court to recuse itself. Therefore, we will deny Petitioner's § 2255 motion in its entirety.

According to our records, Petitioner's motion is the last in the long line of habeas motions filed by the Scarfo crime family. Hopefully, almost a decade after trial, this case will finally be put to rest.

An appropriate order follows.

### *ORDER*

AND NOW, this 5th day of August, 1998, upon consideration of Joseph Pungitore's April 24, 1997 Motion to Vacate, Set Aside,

or Correct Sentence Pursuant to Title 28, United States Code, Section 2255, Petitioner's June 15, 1998 Supplemental Memorandum of Law in Support of Joseph Pungitore's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255, Government's July 13, 1998 Response to Pungitore's Supplemental Memorandum in Support of His 28 U.S.C. § 2255 Motion, Petitioner's July 21, 1998 Reply to Government's Response to Joseph Pungitore's Supplemental Memorandum in Support of His Section 2255 Motion and the testimony presented at May 13, 1998 hearing in this matter, it is hereby ordered that Petitioner's Motion is **DENIED.**

of either the applicable rules governing profes- sional responsibility or the law of this circuit.